The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Willis. The appealing party has not shown good ground to reconsider the evidence; receive further evidence; rehear the parties or their representatives; or amend the Opinion and Award except with minor technical modifications in Findings of Fact Numbers 2, 6, 9, and 22.
* * * * * * * * * * *
The undersigned finds as fact and concludes as matters of law the following which were entered into by the parties at and after the hearing as:
STIPULATIONS
1. Plaintiff did not work for the defendant from 14 February 1994 and continuing through the date of the hearing.
2. Defendants paid temporary total disability compensation to plaintiff through 2 May 1994.
3. At the initial hearing, a Pre-Trial Agreement dated 8 November 1994 was stipulated into evidence by the parties and is incorporated herein by reference.
4. Following the 8 November 1994 hearing, the deposition of Dr. Lee Whitehurst was taken on 6 December 1994 and is hereby made a part of the record of this case.
EVIDENTIARY RULINGS
Subsequent to the withdrawal of plaintiff's attorney, the record was extended to allow the plaintiff time to obtain new counsel; however, plaintiff chose to represent herself. Since defendant wanted to produce additional evidence, which would have been done by deposition had plaintiff been represented by counsel, the defendants submitted the affidavit of Joe Adams, dated 20 December 1994 which was received on 3 January 1995. This document was accepted as an offer of proof for the record, but was not considered by the Deputy Commissioner and will not be considered by the Full Commission in reaching a decision.
* * * * * * * * * * *
The Full Commission adopts the findings of fact found by the Deputy Commissioner and finds as follows:
FINDINGS OF FACT
1. At the time of the initial hearing plaintiff was 40 years old, with a date of birth of 15 June 1954. For her education plaintiff had completed high school. After high school plaintiff testified that she was not sure what further education she had earned, she told Dr. Burch that she had been to two years of business school, and she told Dr. Rozear that she had been to two years of modeling school and one year of business school at Durham Technical College.
2. Before her current claim, plaintiff had a rather extensive medical history; including several different surgeries. In 1971 she was admitted to the psychiatric unit at Durham Regional Hospital. Beginning about one year before her current claim, plaintiff began to receive regular psychiatric treatment with symptoms which included hearing voices. Plaintiff described this treatment as treatment for "seizures" and a "chemical imbalance." However, in records of Hillsborough Family Practice, the diagnosis of chronic depression was made with no mention of seizures. For a year before her current claim plaintiff took anti-anxiety medication on a daily basis. Four months before her current claim, plaintiff suffered from, 1) major depressive disorder, 2) dysthymia, 3) possible secondary depressive disorder, 4) panic disorder, 5) a general anxiety disorder, 6) possible secondary disorder, and 7) multi-somatiform disorder. Plaintiff's psychiatrist considered whether plaintiff should participate in a drug testing procedure, but decided against plaintiff's participation because of her multiple psychiatric problems.
3. On 2 November 1993 (Tuesday) plaintiff was moving a pallet at work. Plaintiff testified that the pallet was water-logged and extremely heavy and that she lifted one end to push the pallet against a pole when she felt sharp pain in her back. Plaintiff told two doctors that she was lifting the pallet overhead when she began to experience back pain. In her first report to a doctor and her first report to a physical therapist, plaintiff reported pain in her left breast, but did not report low back pain. The first mention of back pain was to a physical therapist on 16 November 1993 at her fourth physical therapy session. In any case, defendant has not contested the compensability of the initial incident on 2 November 1993.
4. Plaintiff finished the day on 2 November 1993 and worked the next four days, through Friday. She first sought medical treatment on Monday, 8 November 1993. She told her family doctor that she was unloading (rather than moving) pallets when she experienced chest pain. Her family doctor referred plaintiff to physical therapy which she attended for one month, through 15 December 1993. Plaintiff asked for a referral to an orthopedist, and she was referred to Dr. Richard Burch.
5. Plaintiff's first psychiatric examination after the incident was on 9 November 1993 (one week after the incident and one day after her first examination by her family doctor). Plaintiff had been receiving psychiatric treatment for about a year. At this examination plaintiff told her psychiatrist that she had hurt her chest at work, and she discussed continuing family problems. During the month of physical therapy, plaintiff had two additional psychiatric examinations. At these examinations she told her psychiatrist of two relatives who were in prison, and that she had been "turned in" to the government which had caused her house payment to be increased. She told her psychiatrist that she did not want to return to work for the defendant.
6. Dr. Burch, the orthopedist, examined plaintiff on 7 January 1994. At this time plaintiff suffered from cervical and thoracic strains. Dr. Burch excused plaintiff from regular work. On 30 January 1994 Dr. Burch approved several jobs at defendant which he believed plaintiff could perform.
7. After the orthopedic examination and before she returned to work, plaintiff had two psychiatric examinations. At the first she told her psychiatrist that the defendant had made her mad, that she believed she had another job, that she had problems with family members using drugs, and that her house payment had again been raised because she was "reported."
8. Plaintiff returned to work on 7 February 1994, after Dr. Burch had released her to return to work, although she would later tell doctors that she was forced to return to work ten days before it was approved. For two days (7 and 8 February 1994) plaintiff worked at light duty jobs referred to as "perpetual inventory." In this job plaintiff scanned products with a light-weight electric device to ensure that they were priced correctly. Plaintiff did not scan products over her head nor products at floor level. Plaintiff claimed that this activity caused so much pain that she was unable to get out of bed for a week.
9. After plaintiff had been out of work for a week, plaintiff returned to work on 14 February 1994. She was taken off her scanning job and assigned as a cashier. Plaintiff was told that she did not have to lift heavy objects; and if heavy objects had to be lifted, she could ask for assistance. The store manager assigned James Sigmond to help plaintiff. If plaintiff needed assistance lifting, she could use an internal phone or she could cause her cashier light to blink. Though plaintiff alleged that on 14 February 1994 she injured her back lifting heavy objects from customer's carts, particularly bags of dog food, no one (including plaintiff's witnesses) saw plaintiff lifting heavy objects. Further, dog food bags have double price tags so that one-half of the tag can be removed and exposed to the price scanner without lifting the entire bag. Thus on 14 February 1994, plaintiff did not injure her back during a cognizable time while performing her assigned work duties.
10. The day after plaintiff's second return to work (15 February 1994), plaintiff returned to her family doctor. She was referred back to physical therapy, and she was referred back to Dr. Burch. Dr. Burch examined plaintiff on 17 February 1994. At this time Dr. Burch noted that the etiology of plaintiff's claim of pain was uncertain. It was Dr. Burch's opinion that plaintiff would be best served by having another physician provide her with treatment. Dr. Burch did not make any further appointments.
11. One week after her second return to work (21 February 1994) plaintiff returned to her psychiatrist. At this time plaintiff was "hearing voices" (which had been a complaint before the incident in November 1993). Plaintiff reported that she was in pain and that it was defendant's fault. Plaintiff reported that she was afraid she would hurt someone. In an out-of-body experience, plaintiff saw herself "tearing [her supervisor] all to pieces."
16. The next day (22 February 1994) plaintiff was examined by Dr. Marvin Rozear, a neurologist. Plaintiff had made the appointment by calling Duke University. Dr. Rozear wrote that plaintiff had "numerous long, rambling, bizarre stories to tell." At this time plaintiff was experiencing no neurological abnormalities.
17. A week after the examination by Dr. Rozear (25 February 1994) plaintiff returned to her psychiatrist. Plaintiff told her psychiatrist that she was hearing voices in the walls. Dr. James Wells, Jr., the psychiatrist, was of the opinion that the stress of her job was "precipitive" of her condition; however, he was not aware of the accommodations defendant had made for plaintiff. On 27 May 1994, plaintiff received a second orthopedic examination; and between the examination by Dr. Rozear and the second orthopedic examination (three months), plaintiff returned to her psychiatrist six additional times.
18. An MRI of the back was performed on 2 May 1994. For the lumbar spine there was a small annular tear posteriorly on the left; and for the cervical spine, there was a small central subligamentous disc herniation at spinal level C4-5. For both these conditions there was no nerve root compression. The conclusion of the radiologist was "negative cervical spine" and "negative lumbosacral spine series."
19. The second orthopedic examination was on 27 May 1994 by Dr. Ralph Liebelt. His impression was that the etiology of plaintiff's claim of pain was "uncertain." Plaintiff asked for another evaluation by Dr. Lee Whitehurst, and Dr. Liebelt made the referral.
20. Plaintiff's third orthopedic evaluation was on 12 July 1994 by Dr. Lee Whitehurst, an orthopedic surgeon. Between the examination by Dr. Liebelt and Dr. Whitehurst (two months), plaintiff returned to her psychiatrist four times. During the examination with Dr. Whitehurst plaintiff did not put forth maximum effort and her responses could not be explained on a physical basis. Dr. Whitehurst diagnosed early degenerative spinal disc disease. He gave no permanent partial disability rating because there was no objective finding on which he could base such a rating. At this time plaintiff was capable of performing light to medium work. Based on Dr. Whitehurst's opinion, the undersigned finds that plaintiff retains no permanent partial impairments as a result of the incident of 2 November 1993.
21. From 9 February 1994 and continuing through the date of the hearing defendant has had a job available for plaintiff within her restrictions which she could be expected to perform if she had made an effort to either obtain the job or perform it.
22. Plaintiff's present problems are not the result of a physical cause; but instead, they are the result of psychiatric problems which were not caused by, nor triggered by, the incident of 2 November 1993.
* * * * * * * * * * *
Based upon the findings of fact, the Full Commission concludes as follows:
CONCLUSIONS OF LAW
1. On 2 November 1993, plaintiff sustained an injury by accident arising out of and in the course of her employment with defendant-employer. N.C. Gen. Stat. § 97-2 (6).
2. On 14 February 1994, plaintiff did not sustain an injury by accident arising out of and in the course of her employment with defendant-employer, in that she did not injure her back as a result of a specific traumatic incident while performing her assigned job duties. N.C. Gen. Stat. § 97-6 (2).
3. On 2 November 1993, plaintiff's average weekly wage was $210.00, yielding a compensation rate of $140.00 per week. N.C. Gen. Stat. § 97-2 (5) and Stipulations.
4. Plaintiff is entitled to temporary total disability compensation in the amount of $140.00 per week for the period of time from 8 November 1993 through 6 February 1994. As compensation in excess of the amount due has been paid to plaintiff, she is not entitled to any further compensation. N.C. Gen. Stat. § 97-29.
5. As a result of the injury by accident of 2 November 1993, plaintiff is not entitled to any permanent partial disability compensation. N.C. Gen. Stat. § 97-31.
6. Plaintiff is entitled to the payment of all medical expenses incurred, or to be incurred, as a result of the injury by accident of 2 November 1993. Payment for said medical expenses shall not include any psychiatric treatment plaintiff had received. N.C. Gen. Stat. § 97-25; Brewington v. Rigsbee AutoParts, 69 N.C. App. 168 (1984).
* * * * * * * * * * *
Based on the foregoing findings of fact and conclusions of law, the Full Commission affirms the holding of the Deputy Commissioner and enters the following:
AWARD
1. Plaintiff's claim for temporary total disability and permanent partial disability compensation must be, and the same is hereby, DENIED.
2. Defendants shall pay all medical expenses incurred, or to be incurred, as a result of the injury by accident of 2 November 1993. Payment shall not include any treatment plaintiff has received for any psychological condition.
3. Each side shall pay its own costs, except that defendants shall pay an expert witness fee in the amount of $250.00 to Dr. Lee Whitehurst.
 S/ ______________________ DIANNE C. SELLERS COMMISSIONER
CONCURRING:
S/ ______________________ BERNADINE S. BALLANCE COMMISSIONER
S/ ______________________ LAURA K. MAVRETIC COMMISSIONER